UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BARBARA JEAN NICHOLAS,

                Plaintiff,                     Civil Action No. 10-11429

        v.                        District Judge Sean F. Cox
                                    Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 11]**

Plaintiff Barbara Nicholas brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkts. 8, 11.)

**I. RECOMMENDATION**

For the reasons set forth below, this Court finds that the Administrative Law Judge's failure to address a line of medical evidence pertaining to Plaintiff's carotid artery disease should not be overlooked as harmless error. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II.  REPORT

### A.  Procedural History

Plaintiff alleges that she became unable to work on January 1, 2004.  (Tr. 75.)  The Commissioner disapproved her disability claim on July 28, 2006.  (Tr. 50-54.)  Plaintiff then filed a timely request for a hearing, and on June 2, 2008, Plaintiff appeared with counsel before Administrative Law Judge ("ALJ") Jerome Blum, who considered the case *de novo*.  (Tr. 32.)  In a decision dated October 1, 2008, the ALJ found that Plaintiff was not disabled.  (Tr. 16-19.)  The ALJ's decision became the final decision of the Commissioner on February 3, 2010, when, after considering additional exhibits (AC 5B, AC 18F-21F), the Appeals Council denied Plaintiff's request for review.  (Tr. 1, 5.)[1]  Plaintiff filed this suit on April 9, 2010.

### B.  Background

Plaintiff was 53 years old at the time of the ALJ's decision.  (Tr. 82.)[2]  She attended school through part of eleventh grade and holds a certification in dental assisting.  (Tr. 33, 91.)  Plaintiff's past work includes creating dental molds which required her to stand for four hours per day and walk for one.  (Tr. 87.)  On occasion she would lift as much as 50 pounds.  (*Id.*)

#### 1.  Plaintiff's Testimony

At the June 2, 2008, hearing before the ALJ, Plaintiff testified that she last worked in October 2002 because of seizures and the effects of a hysterectomy.  (Tr. 43.)  As to the former,

---

[1]Where the Appeals Council considers additional evidence, but denies a request to review the ALJ's decision, this Court can consider that evidence only to determine whether a case should be remanded pursuant to the sentence six of 42 U.S.C. § 405(g).  *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

[2]The regulations consider Plaintiff to be a person "closely approaching advanced age (age 50-54)."  *See* 20 C.F.R. § 404.1563(d).

2

Plaintiff explained that she had a grand mal seizure in 2002. (Tr. 41-42.) She stated that the cause of that seizure is unknown, but it was not attributed to the condition of her carotid arteries (discussed below). (Tr. 41.) When asked if she had any petit mal seizures since then, Plaintiff responded that she has had times "where my legs collapse, but I'm awake [and] aware of . . . what's going on." (Tr. 42.) Plaintiff also provided that "occasionally" she "kind of hit[s] the floor." (Tr. 43.) Plaintiff testified that she had a hysterectomy in 2006 which required two surgical repairs.[3] (Tr.37-38.) She explained that she has lower back pain attributable to these surgeries. (Tr. 35-36.) Her hysterectomy-related surgeries also require her to urinate frequently. (Tr. 36.)

Functionally, Plaintiff explained that she can sit for "maybe up to two hours," stand for "15 to 20 minutes," and walk for "maybe 15 minutes or so." (Tr. 35.) She takes stairs "slow" and "hold[s] on to the railing." (Tr. 38.) She testified that she is prohibited from standing for longer because her "legs shake and [her] lower back burns if [she] bend[s] over." (Tr. 35.) She is able to drive, and said she had the ability to drive herself to the hearing. (Tr. 40.) Because of the pain in her lower back, Plaintiff attested to being unable to "lift anything more than maybe a gallon of milk." (Tr. 35.)

Plaintiff also testified to mental limitations. Specifically, she explained that she "get[s] very quiet" which is unlike her normal self: "I like to be laughing and have fun and just feeling, you know, I don't know, [I'm] just upset of what's happened[,] . . . but I try to lift myself up . . . the best I can." (Tr. 40.) She testified that she has difficulty concentrating and remembering, and that her

---

[3]The testimony on this point is a bit unclear. The medical evidence reveals that Plaintiff had a hysterectomy in July 2006, (Tr. 205), a repair of a "vesicovaginal fistula" in August 2006, (Tr. 305), a second repair in September 2006, (Tr. 363), and a third repair in February 2007, (Tr . 449-50, 456).

primary-care physician had prescribed her "an anxiety medication." (Tr. 39-40.)

### 2. *Medical Evidence*

In October 2005, Plaintiff's general treating physician, Dr. Kevin Thompson, referred Plaintiff to Dr. Norman Burns, a neurologist, for "consultation and evaluation regarding possible seizures." (Tr. 128.) Dr. Burns noted that,

> over the last couple of months, she developed some strange numbness, tingling, and pain sensation located on the scalp and in her head. She denies any alteration or loss of consciousness associated with this. She denies any blurry vision, double vision, numbness, tingling or weakness. She states over the last week or two these symptoms have been decreasing.

(*Id.*) Dr. Burns recommended that a Magnetic Resonance Angiogram ("MRA") and an MRI be taken of Plaintiff's brain. (Tr. 129.)

In a November 2005 follow-up visit, Dr. Burns noted that Plaintiff's headaches "have improved significantly, and for the most part now she is no longer having headaches." (Tr. 124.) Plaintiff described "episodes where she feels somewhat lightheaded," which "usually occurs when she is standing up, and actually occurs most frequently when she is getting up and out of her car." (*Id.*)

On December 3, 2005, Plaintiff returned for another follow-up with Dr. Burns. (Tr. 119.) Plaintiff reported that she had "no further headaches," and "denie[d] any episodes of numbness, tingling, weakness, slurred speech, blurry vision, or double vision." (*Id.*) He remarked that her October 2005 MRA "show[ed] hypoplasia[4] of the right entire vascular system," and that she had

---

[4]Stedman's Medical Dictionary (*Stedman's*) (27th ed. 2000) ("1. Underdevelopment of a tissue or organ, usually due to a deficiency in the number of cells. 2. Atrophy due to destruction of some of the elements and not merely to their general reduction in size.").

"50-69% stenosis[5] in [her] left internal carotid artery." (*Id.*)  His conclusion was that Plaintiff had carotid artery disease, and noted that while his "findings are not likely to be related to her symptoms . . . they are somewhat concerning." (*Id.*)  Accordingly, Dr. Burns referred Plaintiff to Dr. William Oppat, a vascular surgeon.  (*Id.*)

During her first visit with Dr. Oppat on January 31, 2006, Plaintiff "noted some bilateral lower extremit[y] weakness and dis-coordination." (Tr. 135, 171.)  Dr. Oppat stated that "[t]here seems to be some unusual positioning that precipitates the symptoms.  The symptoms usually resolve within a few seconds." (Tr. 135.)  Plaintiff reported walking the stairs in her home "without difficulty" and the ability "to walk any distance she wishes." (*Id.*)  Upon reviewing the MRA and a November 2005 ultrasound of Plaintiff's carotid arteries, Dr. Oppat concluded that Plaintiff "has moderate carotid occlusive disease and what appears to be hypoplastic right carotid artery," and that "there appears to be absence of the right vertebral artery." (Tr. 136.)  Dr. Oppat recommended a cerebral angiography.

On March 1, 2006, Plaintiff underwent the recommended procedure.  (Tr. 133-34, 223-40.)  On March 16, 2006, Dr. Oppat reported that the "arch and four vessel angiography" revealed that "the right internal carotid artery is fully thrombosed [clotted].  Perfusion of the right hemisphere of the brain occurs through a moderately stenosed left internal carotid artery." (Tr. 131.)  He concluded,

> Nicholas' near-syncopal[6] spells seem to be positional and suggest poor collateralization of blood flow within the cerebral

---

[5]*Stedman's* ("A stricture of any canal or orifice.").

[6]*Stedman's* (defining "syncope" as a "[l]oss of consciousness and postural tone caused by diminished cerebral blood flow.").

> hemispheres. . . .  If we could demonstrate that there is an area of the
> brain that is poorly perfused and correlates with her symptoms it
> would help us understand what options are available to improve the
> cerebral circulation.

(Tr. 131-32.)

On March 30, 2006, Dr. Allan Fraiberg performed a Neurolite scan of Plaintiff's brain.

(Tr. 130.)  He noted "[n]o areas of decreased perfusion are seen on the radioisotope brain scan to

correspond to the findings described on the carotid and vertebral angiogram of 3/1/2006."  (*Id.*)

On May 8, 2006, Plaintiff returned to see Dr. Oppat.  His corresponding note provides,

> [Mrs. Nicholas] remains orthostatic and has had no clear syncopal
> events. . . .
>
> I reviewed the Diamox perfusion scan with Mrs. Nicholas at length.
> As I remain unclear whether [her] symptoms result from severe
> vascular occlusive disease and poor perfusion of the brain, I have
> taken the liberty to loosely discuss the case with a nerosurgeon [,Dr.
> Fernando Diaz,] who has a great deal of experience in intracerebral
> perfusion . . . . [He] would like to evaluate the patient and consider
> her for a PET scan.  As I do not think that there is any advantage in
> addressing the 40% stenosis within the left carotid artery, and
> recanalization of the occluded right internal carotid artery is not
> routinely suggested, I would be interested to hear Dr. Diaz' opinion
> if any further evaluation is necessary.

(Tr. 166.)

In June 2006, Dr. William Joh, acting on behalf of Disability Determination Services

("DDS"), reviewed Plaintiff's medical records.  (Tr. 49, 173-80.)  The primary diagnosis on

Dr. Joh's Physical Residual Functional Capacity assessment provides "cerebral vascular

insufficiency."  (Tr. 173.)  He noted that Plaintiff's "near syncope and weakness of lower

extremities" was "not recurrent," however, and that Plaintiff had one seizure which was also not

recurrent and unmedicated.  (Tr. 174.)  His assessment also acknowledged that medical testing

6

revealed "complete occlusion of right internal carotid and partial occlusion of left internal carotid arteries." (*Id.*) He concluded that Plaintiff could occasionally and frequently lift 20 and 10 pounds, respectively, and that Plaintiff could stand or walk for six hours in an eight-hour day and could sit for six hours in an eight-hour day. (*Id.*)

Plaintiff also asserts that she has mental impairments that contribute to her inability to work. On June 14, 2006, Dr. S. Rastogi examined Plaintiff on behalf of Disability Determination for Social Security Administration. (Tr. 181.) Dr. Rastogi noted that Plaintiff "described no previous psychiatric history and denies any depression" but indicated "difficulty in concentration" and "memory problems." (Tr. 181.) Plaintiff also described being "worried with no reason" but denied symptoms of "panic disorder," suicidal behavior, hallucination, or delusion. (Tr. 181.) Upon examination, Dr. Rastogi found that Plaintiff's "stream of mental activity was slow, organized and coherent," that she has "fair contact with reality," and "[s]he likes herself." (Tr. 182.) Dr. Rastogi also remarked that "claimant appears to have some symptoms of mood swings in the form of some positive self worth or grandiosity associated with the depression and problems with anxiety which is not panic in nature." (Tr. 183.) Dr. Rastogi diagnosed Plaintiff as follows:

| | |
|---|---|
| AXIS I: | Bipolar mood disorder; depressed. |
| AXIS II: | Deferred. |
| AXIS III: | Due for hysterectomy; seizure disorder. |
| AXIS IV: | Stress due to medical condition; unable to function. |
| AXIS V: | GAF = 50. |

(*Id.*)[7] Her prognosis was "guarded." (*Id.*)

---

[7]*See Stedman's* (explaining that in the "Diagnostic and Statistical Manual of Mental Orders" "the axes are I, clinical disorders; II, personality disorders and mental retardation; III, general medical disorders; IV, psychosocial and environmental stressors; and V, overall level of functioning.").

On July 25, 2006, Dr. Zahra Khademian completed a Psychiatric Review Technique Form. (Tr. 188-200.) As did Dr. Rastogi, Dr. Khademian diagnosed Plaintiff with bipolar mood disorder and depression. (Tr. 200.) Dr. Khademian, concluded that Plaintiff's mental impairments were not severe. (Tr. 188.) Regarding the "B criteria" of Listing 12.04,[8] Dr. Khademian found that Plaintiff had "mild" limitations in (1) daily living, (2) social functioning, and (3) concentration, persistence, or pace. (Tr. 198.) Dr. Khademian provided that Plaintiff suffered from no episodes of decompensation. (*Id.*) Plaintiff was noted to have "some" decreased memory, but "very good concentration" and "adequate" judgment. (Tr. 200.)

### 3. Vocational Expert's Testimony

The vocational expert ("VE"), Dr. James Fuller, testified briefly. As between the ALJ and the VE, the following is the relevant portion of their colloquy:

> Q      And what's her work history, Dr. Fuller?
> A      The work history is that of a dental lab technician. It is a skilled job, classified by the DOT as light physical demand.
> Q      Light, skilled or semi-skilled?
> A      Skilled.
> Q      Skilled? Light meaning under 20 pounds?
> A      That's correct.
> Q      So if she could stand and work with up to 20 pounds eight hours a day, she can return to her former job?
> A      That's correct.

(Tr. 46.) On cross, the VE provided that if a person had to take breaks outside of normal work breaks, that person would be precluded from work. (Tr. 47.)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage

---

[8]20 C.F.R. pt. 404, subpt. P., app'x 1, § 12.04(B).

earners who become disabled prior to expiration of their insured status) "are available only for those

who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines

"disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are
denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments
that "significantly limits . . . physical or mental ability to do basic work activities," benefits
are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe
impairment that is expected to last for at least twelve months, and the severe impairment
meets or equals one of the impairments listed in the regulations, the claimant is conclusively
presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied
without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other
work exists in the national economy that plaintiff can perform, in view of his or her age,
education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers

to the [defendant]."  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir.

9

1994).

### D.  The Administrative Law Judge's Findings

In a short, 4-page narrative the ALJ found that Plaintiff was not entitled to disability benefits. (Tr. 16-19.)  At step one, he found that Plaintiff has not engaged in substantial gainful activity since January 1, 2004—Plaintiff's alleged onset date.  (Tr. 18.)  At step two, it appears the ALJ found that Plaintiff had the following severe impairments: low back pain, depression, and urinary urgency/frequency.  (*See* Tr. 19.)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (*Id.*)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity "to perform the exertional and nonexertional requirements of light work."  (*Id.*)  "Light work" involves

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).  At step four, the ALJ found that Plaintiff could perform her past relevant work as a dental lab technician.  (Tr. 19.)

Notably, other than a single, passing mention of "arteriosclerosis,"  the ALJ's decision contains no discussion of Plaintiff's carotid artery disease.

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to

apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800

11

F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

### F.  Analysis

> #### 1.  The ALJ's Failure to Discuss Medical Evidence Pertaining to Plaintiff's Carotid Artery Disease Is Not Excusable as Harmless Error

Plaintiff asserts that the ALJ's RFC or hypothetical should have included Plaintiff's carotid artery disease or specific symptoms attributable to that impairment.  There is no requirement, however, that a hypothetical question list all the claimant's medical conditions.  *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004).  Rather, an ALJ's residual functional capacity determination must accurately capture a claimant's *limitations*: what the claimant "can and cannot do." *Id.* at 631, 633; *see also* SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) ("RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms . . . may *cause* physical or mental *limitations* or restrictions that may affect his or her capacity to do work-related physical and mental activities." (emphases added)).

The Court does not read Plaintiff's claim of error so narrowly, however.  Rather, it appears that Plaintiff not only asserts that the ALJ provided an inaccurate hypothetical to the VE, but that the ALJ did so because he failed to follow the procedural requirements that help ensure an accurate RFC assessment, accompanying hypothetical, and step four determination.  In particular, Plaintiff suggests that the ALJ failed to comply with the narrative requirements set forth in Social Security

Ruling ("SSR") 96-8p.  (*See* Pl.'s Mot. at 8.)[9]  The Commissioner asserts that the Court should excuse any procedural defect as harmless: "The ALJ's omission of any discussion of the evidence relating to Plaintiff's carotid artery condition is harmless error because it did not affect the outcome of his decision."  (Def.'s Mot. at 9.)

SSR 96-8p provides that an "RFC assessment must be based on *all* of the relevant evidence in the case record," which includes "medical history," "medical source statements" and "[e]ffects of symptoms . . . that are *reasonably attributed* to a medically determinable impairment."  1996 WL 374184, at *5 (second emphasis added).  In assessing an RFC, an ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Id.* SSR 96-8p also provides that the ALJ's RFC assessment must be made transparent to the reviewing Court; in particular, the ruling provides:

> NARRATIVE DISCUSSION REQUIREMENTS
>
> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). . . .
>
> Symptoms. In all cases in which symptoms . . . are alleged, the RFC assessment must:
>
> * Contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's . . . symptoms and the adjudicator's personal observations, if appropriate; . . . [and]

_____

[9]SSRs "are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy and interpretations" adopted by the agency. 20 C.F.R. § 402.35(b)(1); *see also Evans v. Comm'r of Soc. Sec.*, 320 F. App'x 593, 596, 2009 WL 784273, at *2 (9th Cir. Mar. 25, 2009) ("'Federal statutes, administrative regulations and Social Security Rulings together form a comprehensive scheme of legal standards that ALJs must follow in determining whether a claimant is entitled to disability benefits.'" (quoting *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990))).

* Set forth a logical explanation of the effects of the symptoms . . . on the individual's ability to work.

*Id.* at *6-7 (internal footnote omitted).

While making a single, passing mention to "arteriosclerosis," the ALJ does not discuss any of the medical evidence resulting from an investigation into Plaintiff's symptoms of lightheadedness (or near-syncopal spells) and lower-extremity weakness. In December 2005, Dr. Burns, a neurologist, concluded that Plaintiff's MRA "show[ed] hypoplasia of the right entire vascular system," and that she had "50-69% stenosis in [her] left internal carotid artery." (Tr. 119.) He further concluded that Plaintiff had carotid artery disease, and while his "findings are not likely to be related to her symptoms . . . they are somewhat concerning." (*Id.*) Dr. Burns then referred Plaintiff to Dr. Oppat, a vascular surgeon, who recommended that Plaintiff undergo a cerebral angiogram. (Tr. 136.) That procedure revealed that "the right internal carotid artery is fully thrombosed [clotted]. Perfusion of the right hemisphere of the brain occurs through a moderately stenosed left internal carotid artery." (Tr. 131.) Dr. Oppat noted, "Nicholas' near-syncopal spells seem to be positional and suggest poor collateralization of blood flow within the cerebral hemispheres." (Tr. 131-32.) Accordingly, Plaintiff underwent a Neurolite brain-scan. Although the physician conducting the scan concluded that "[n]o areas of decreased perfusion are seen on the radioisotope brain scan to correspond to the findings described on the carotid and vertebral angiogram," (Tr. 130), Dr. Oppat nonetheless remarked that he "remain[ed] unclear whether [her] symptoms result from severe vascular occlusive disease and poor perfusion of the brain," (Tr. 166). He accordingly recommended that Plaintiff see a neurosurgeon, Dr. Diaz. (Tr. 166.) The results of Dr. Diaz's investigation are not part of the medical record. At the hearing before the ALJ Plaintiff testified that "I even saw a brain surgeon and . . . they said everything looked fine." (Tr. 44.)

14

The Court agrees with the Commissioner that the medical specialists that investigated Plaintiff's lightheadedness and lower-extremity weakness did not conclusively associate those symptoms with carotid artery disease. On the other hand, no physician concluded with any certainty that those symptoms were not attributable, at least in part, to that condition. (Tr. 119, 130, 166.) The Commissioner directs the Court's attention to an RFC evaluation completed by Dr. Joh, a DDS examiner. (*See* Def.'s Mot. at 9.) But Dr. Joh appears to have implicitly credited Plaintiff's near-syncopal events: he limited Plaintiff to occasional stair, ladder, and scaffold climbing; occasional kneeling and crouching; and, most tellingly, proscribed working with hazards, which, according to the RFC assessment form, includes working with "machinery." (Tr. 174-75, 77.) Further, it is undisputed that Plaintiff's lightheadedness was credible enough for her specialists to embark upon a lengthy investigation, which included multiple brain scans and a cerebral angiography.

The Court cannot readily conclude that if the ALJ had considered and discussed the medical evidence related to Plaintiff's carotid artery disease in the manner required by SSR 96-8p, he would have reached the same conclusion at step four. The ALJ found that Plaintiff could perform her past relevant work as a dental lab technician. (Tr. 18-19.) But he did not explain that he was discrediting Plaintiff's symptoms of lightheadedness and near-syncopal events because the medical evidence did not conclusively connect those symptoms with carotid artery disease. *See* SSR-96-8p, 1996 WL 374184, at *7 ("In all cases in which symptoms . . . are alleged, the RFC assessment must . . . [c]ontain a thorough discussion and analysis of the objective medical and other evidence, including the individual's . . . symptoms."). Nor did he take the alternative route of explaining that while Plaintiff's symptoms were credible, those symptoms would not preclude her performing her past relevant work. *Id.* (requiring that the ALJ's narrative "[s]et forth a logical explanation of the effects

15

of the symptoms . . . on the individual's ability to work.").[10]  In fact, the ALJ did not mention her

near-syncopal events and lightheadedness at all.  The Court emphasizes that this is not a case where

the ALJ discussed some of the evidence related to a medical condition but not all of it.  Rather, the

ALJ failed to discuss an entire line of medical evidence.  The Court recognizes that harmless error

review allows a reviewing court to work through some of the procedural analysis that an ALJ omits

to determine whether the ALJ's decision would have been the same.  But under these facts, the Court

declines the Commissioner's invitation to make *all* the required factual findings in the first instance.

*Cf. Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 657 (6th Cir. 2009) (cautioning that "in some

cases it may be difficult, or even impossible, to assess whether an ALJ's failure" to comply with a

procedural regulation is harmless; noting that one such situation may be where an ALJ fails to

"acknowledge or consider" "evidence favorable to the claimant"); *Hurst v. Sec'y of Health &*

*Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) ("In the absence of an explicit and reasoned

rejection of an entire line of evidence, the remaining evidence is 'substantial' only when considered

in isolation.  It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or

rejecting particular sources of evidence.  It is absolutely essential for meaningful appellate review."

_____

[10]The Commissioner has directed the Court's attention to the description of dental laboratory technician as provided by the Dictionary of Occupational Titles. (Def.'s Mot. at 10 n. 2.) That entry provides that Plaintiff's job, as it is generally preformed, involves working with machinery that is arguably hazardous to someone suffering from occasional near-syncopal spells:

> Performs any combination of following tasks to fabricate and repair dental appliances . . . using handtools, molding equipment, and bench fabricating machines . . . .  Fabricates full or partial dentures, using . . . articulators, grinders, and polishers. . . .  Removes excess plastic . . . using grinding and polishing tools and ultrasonic equipment . . . .  Bends and solders gold and platinum wire to construct wire frames for dentures, using soldering gun . . . .

*See* DOT § 712.381-018, 1991 WL 679222.

(quoting *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984))); *Lassen v. Comm'r of Soc. Sec.*, No. 1:08-cv-1037, 2010 WL 914668, at *8 (W.D. Mich. Mar. 12, 2010) ("It is the Commissioner's job to make the factual findings based on the administrative record, and it is the court's role to review those findings under a deferential substantial evidence standard.  Departures from this framework should be relatively infrequent.").

Accordingly, this Court recommends that the case be remanded to the Commissioner to make the findings required by SSR 96-8p with respect to Plaintiff's carotid artery disease.

> ### 2.  *The ALJ's Failure to Comply With 20 C.F.R. § 404.1520a is Excusable as Harmless Error*

Plaintiff argues that the ALJ "failed to properly evaluate [her] depression in accordance with 20 C.F.R. § 404.1520a . . . and the resulting degree of functional limitation was not rated under the Rule 12.00 category applicable to depression."  (Pl.'s Mot. at 9.)  More specifically, Plaintiff asserts that the ALJ failed to discuss her functional limitations in the four broad categories identified in § 404.1520a(c)(3), which is required by subsections (d)(2) and (d)(3).  (*See id.*)  The Commissioner concedes that the ALJ's narrative is procedurally deficient, but asserts that "even though the ALJ did not apply the 'special technique' to determine the severity of Plaintiff's mental impairments, any error is harmless because the evidence persuasively supports the ALJ's ultimate conclusion that Plaintiff did not have any significant mental limitations."  (Def.'s Mot. at 11.)

In *Rabbers*, the Sixth Circuit was faced with this same issue, and explained how a reviewing court determines whether an ALJ's non-compliance with a procedural regulation amounts to harmless error.  582 F.3d at 655.  The court stated that "even if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial

17

right.'" *Id.* at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004)). Regarding § 404.1520a specifically, the court concluded that it was not a substantial right. *See Rabbers*, 582 F.3d at 656-57. Accordingly, the issue before this Court is whether Plaintiff was prejudiced on the merits by the ALJ's failure to comply with 20 C.F.R. § 404.1520a.

### *(a) The Procedural Requirements of 20 C.F.R. § 404.1520a*

The regulation at issue requires that an ALJ apply a "special technique" at steps 2 and 3 to evaluate a claimant's mental impairment. *See* 20 C.F.R. § 404.1520a(a). At step 2, an ALJ must "rate the degree of functional limitation resulting from [a medically determinable mental] impairment(s)" in "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(b)(2), (c)(3). Regarding the first three functional areas, the following five-point scale is used: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). As to the last functional area, episodes of decompensation, a claimant is scored on a four-point scale: none, one or two, three, four or more. *Id.* "If the ALJ rates the first three functional areas as 'none' or 'mild' and the fourth area as 'none,' the impairment is generally not considered severe and the claimant is conclusively not disabled." *Rabbers*, 582 F.3d at 653 (quoting 20 C.F.R. §§ 404.1520a(d)(1)).[11]

If the impairment is severe, the ALJ proceeds to step three and determines whether the claimant's severe impairment meets or is medically equivalent to a listed impairment. *Id.* (citing 20

---

[11]More precisely, the regulation states: "If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, *unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see § 404.1521).*" 20 C.F.R. § 404.1520a(d)(1) (emphasis added).

18

C.F.R. §§ 404.1520a(d)(2)).   As relevant here, Listing 12.04 provides: "The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied."   20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.04.   The B criteria are met by a showing of at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.04.   The C criteria are satisfied by a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:" (1) "repeated episodes of decompensation, each of extended duration," (2) a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;" or (3) a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."   *Id.*

If the ALJ determines that the claimant has a severe mental impairment that fails to meet or medically equal a listed impairment, the ALJ will then assess the claimant's RFC and continue on with the remaining two steps of the five-step process.   *See* 20 C.F.R. § 404.1520a(d)(3).

19

*(b) Plaintiff was Not Substantially Prejudiced on the Merits by the ALJ's Failure to Comply with the Procedural Requirements Set Forth in 20 C.F.R. § 404.1520a*

It is undisputed that the ALJ failed to evaluate the B criteria at step two as required by 20 C.F.R. § 404.1520a. However, the Court believes that this procedural flaw was harmless: the ALJ continued on to step three, and he included Plaintiff's depression as an impairment in his step-three determination. (Tr. 19.) *See Rabbers*, 582 F.3d at 658 ("First, the ALJ's failure to rate the B criteria at step two . . . was clearly harmless. Notwithstanding this error, the ALJ ultimately concluded that [plaintiff] had a severe mental impairment and proceeded to step three, which was all [plaintiff] could have asked for.").

At step three, the ALJ found that Plaintiff's depression did not meet or medically equal a listed impairment. (Tr. 19.)[12]  The ALJ erred, however, by failing to evaluate the B and C criteria at this step. The Court concludes that this error should be excused. As the Commissioner correctly states, "the only medical opinion of record addressing the functional impact of Plaintiff's mental condition supports the ALJ's finding that Plaintiff had no significant mental restrictions." (Def.'s Mot. at 11.) Dr. Khademian found that Plaintiff had a medically determinable mental impairment: "bipolar-depressed." (Tr. 191.) Regarding the B criteria, however, Dr. Khademian found that Plaintiff had only "mild" limitations in the first three broad functional areas, and, regarding the last functional area, Plaintiff had no episodes of decompensation. (Tr. 198.) Dr. Khademian also found

---

[12]Regarding Plaintiff's mental impairments, it appears that the ALJ did not have to evaluate them at step three. As will be discussed immediately below, the only psychiatric assessment in the Transcript provides that Plaintiff had no episodes of decompensation, and that Plaintiff only had "mild" functional limitations in the other three functional areas, (Tr. 188-201). *See Rabbers*, 582 F.3d at 653 ("If the ALJ rates the first three functional areas as 'none' or 'mild' and the fourth area as 'none' the impairment is generally not considered severe and the claimant is conclusively not disabled." (citing 20 C.F.R. § 404.1520a(d)(1))).

that the medical evidence did not establish the presence of any C criteria.  (Tr. 199.)

Although not cited by Plaintiff,  Dr. Rastogi's evaluation does not require a finding that she was prejudiced on the merits.   Dr. Rastogi did not rate Plaintiff on any of the four functional categories.  (Tr. 181-84.)  Thus, Dr. Rastogi's evaluation does not directly contradict that of Dr. Khademian.  Nor does it indirectly do so.

Consistent with Dr. Khademian's assessment, Dr. Rastogi diagnosed Plaintiff with "bipolar mood disorder; depressed." (Tr. 183.)   Regarding restrictions in activities in daily living,[13] Dr. Rastogi noted that Plaintiff drives, "works and does household chores," goes to bed at 9:30 and wakes at 5:00, showers every day, and her "grooming and hygiene were fair." (Tr. 182.)  Related to Plaintiff's social functioning,[14] Dr. Rastogi noted that "[s]he has been living with her family and has friends. She talks to neighbors." (*Id.*)  As is relevant to Plaintiff's difficulties in maintaining concentration, persistence, or pace,[15] Dr. Rastogi noted that Plaintiff's "mental activity was slow, organized and coherent." (Tr. 182.)  Dr. Rastogi did not indicate any "episodes of decompensation, each of extended duration." (*See generally*, Tr. 181-83.)

The  Court  acknowledges  that  Dr. Rastogi  assigned  Plaintiff  a  Global  Assessment  of

---

[13]Activities of daily living "include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.00(C)(1).

[14]Social functioning involves a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.00(C)(2).

[15]"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. " 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.00(C)(3).

Functioning ("GAF") score of 50, and a score of "41-50 reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006).[16]  However, the mental disorder listings, such as Listing 12.04 make no reference to GAF scores.  In fact, "the Commissioner 'has declined to endorse the Global Assessment Functioning score for use in the Social Security and Supplemental Security Income disability programs, and has indicated that Global Assessment Functioning scores have no direct correlation to the severity requirements of the mental disorders listings.'" *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) (internal alterations omitted) (quoting *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005)); *see also Kornecky*, 167 F. App'x at 511("[A]ccording to the [Diagnostic and Statistical Manual of Mental Disorders]'s explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning. . . .  [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place."). Moreover, Dr. Rastogi did not accompany his relatively low GAF score with any suggestion that Plaintiff could not work, nor did he explain how that score might translate into functional limitations. *See Kornecky*, 167 F. App'x at 511("'In the absence of any evidence indicating that [the doctor] assigned this GAF score [50] because he perceived an impairment in plaintiff's ability to work, the score, standing alone, does not establish an impairment seriously interfering with plaintiff's ability to perform basic work activities.'" (quoting *Quaite v. Barnhart*, 312 F. Supp. 2d

---

[16]Global Assessment of Functioning "is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. . . . A GAF score . . . allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky*, 167 F. App'x at 503, n.7.

1195, 1200 (E.D. Mo. 2004))).  And Plaintiff has made no argument that a GAF score of 50 is inconsistent with the ALJ's finding that her mental impairments did not meet or medically equal a listed impairment.  Accordingly, Plaintiff's GAF score does not preclude a finding of harmless error at step three.

Most important—and in contrast to the carotid artery evidence—is that the ALJ discussed Dr. Rastogi's evaluation in his narrative, which clearly evidences that he considered it.  (Tr. 17-18.)[17]  The ALJ nonetheless concluded that "there is no indication that her symptoms of depression or anxiety present a disabling mental impairment." (Tr. 18.)  In addition, Dr. Khademian, the only physician to have rated Plaintiff's limitations, considered and discussed Dr. Rastogi's opinion yet still concluded that Plaintiff had only "mild" limitations in the first three B criteria.  (Tr. 200.)

Other than Dr. Khademian's and Dr. Rastogi's evaluations, Plaintiff did not provide the ALJ with any other medical evidence pertaining to her depression or bipolar disorder.  In fact, the ALJ noted that "the claimant has not undergone any outpatient psychotherapy or counseling and has never been admitted to a mental health facility." (Tr. 17.)  Plaintiff also denied having been seen by a doctor or clinic for mental problems that limit her ability to work.  (Tr. 88.)  Further, there is no evidence to support a C criteria finding at step three.  In particular, there is no "*[m]edically documented history* of a chronic affective disorder of *at least 2 years' duration* that has caused more than a minimal limitation of ability to do basic work activities." 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.04 (emphases added).

Accordingly,  the Court concludes that the ALJ's step three finding would not have changed

---

[17]Although the ALJ did not mention Dr. Rastogi by name, he discussed a June 14, 2006, "consultative psychiatric evaluation."  (Tr. 17.)  This was the date of Plaintiff's visit with Dr. Rastogi.  (Tr. 181-84.)

had he complied with the procedural requirements set forth in 20 C.F.R. § 404.1520a and the omission is excusable as harmless error.

### G.  Conclusion

For the foregoing reasons, this Court finds that the ALJ's failure to address a line of medical evidence pertaining to Plaintiff's carotid artery disease cannot be overlooked as harmless error. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED for the ALJ to comply with all procedural requirements for calculating Plaintiff's RFC, including SSR 96-8p.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  A copy of any objections is to be served upon this magistrate judge. E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due

within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service

of the response.  E.D. Mich. LR 72.1(d)(3), (4).




                                   s/Laurie J. Michelson_____
                                   LAURIE J. MICHELSON
                                   UNITED STATES MAGISTRATE JUDGE

Dated:  May 10, 2011


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on May 10, 2011.


                                   s/Jane Johnson_____
                                   Deputy Clerk